# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOSEPH HORMAN and STEVEN GREEN, : 
Derivatively for the Benefit of and on :
Behalf of Nominal Defendant, UNITED :
PARCEL SERVICE, INC., :
                                         :
             Plaintiffs, :
                                           :
           v. :       **C.A. No. 12290-VCS**
                                           :
DAVID P. ABNEY, RODNEY C. ADKINS, :
MICHAEL J. BURNS, D. SCOTT DAVIS, :
WILLIAM R. JOHNSON, DR. CANDACE :
KENDLE, ANN M. LIVERMORE, RUDY :
H.P. MARKHAM, CLARK T. RANDT, JR., :
CAROL B. TOME and KEVIN M. WARSH, :
                                           :
             Defendants, :
                                           :
            and :
                                           :
UNITED PARCEL SERVICE, INC., a :
Delaware corporation, :
                                           :
               Nominal Defendant. :

## MEMORANDUM OPINION

Date Submitted: October 19, 2016
Date Decided: January 19, 2017

Peter B. Andrews, Esquire, Craig J. Springer, Esquire, and David M. Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware; Judith S. Scolnick, Esquire, Thomas L. Laughlin, Esquire, and Scott R. Jacobsen, Esquire, of Scott + Scott Attorneys At Law, LLP, New York, New York; and Jesse Strauss, Esquire of Strauss Law P.L.L.C., New York, New York, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, John P. DiTomo, Esquire, and Richard Li, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Jamie A. Levitt, Esquire and Steven T. Rappoport, Esquire of Morrison & Foerster LLP, New York, New York; and Philip T. Besirof, Esquire of Morrison & Foerster LLP, San Francisco, California, Attorneys for Defendants and Nominal Defendant.

**SLIGHTS, Vice Chancellor**

Stockholders of United Parcel Service, Inc. ("UPS" or the "Company") have brought this derivative action on behalf of the Company against members of its Board of Directors (the "Board") alleging that they breached their fiduciary duty of loyalty by consciously failing to monitor and manage UPS's compliance with state and federal laws governing the transportation and delivery of cigarettes. Plaintiffs seek to recover for the Company losses it has or will sustain as a result of a pending enforcement action against the Company in federal court for illegally shipping untaxed cigarettes in which the government seeks approximately $180 million in damages and penalties.

After receiving UPS's response to their demand for books and records under 8 *Del. C.* § 220, Plaintiffs filed their Verified Stockholder Derivative Complaint (the "Complaint") in which they set forth a single count—breach of fiduciary duty arising from a failure of oversight, well known in Delaware corporate law as a *Caremark* claim.[1] They allege the directors either failed to implement a reporting and monitoring system with respect to the shipment of illegal cigarettes or, having implemented a system, they ignored red flags that UPS had abandoned its compliance with that system. The failure of oversight is all the more troubling,

---

[1] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996), *aff'd sub nom Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) (reviewing and restating the duties of directors to oversee corporate operations).

1

according to Plaintiffs, because it occurred in the wake of a prior government investigation of UPS's illegal cigarette shipments that was resolved in 2005 by way of an Assurance of Discontinuance Agreement ("AOD") in which UPS committed to comply with applicable laws and to establish effective monitoring systems going forward. The AOD also provided that UPS could be subject to a penalty of up to $1000 per violation of the AOD as well as exposure to further liability under state and federal law. Plaintiffs allege that UPS and its Board consciously ignored the requirements of the AOD from 2010 through 2014 and have thereby exposed the Company to substantial liability.

Plaintiffs did not make a demand on the Board to pursue these claims before filing suit. They maintain that any such demand would have been futile since each member of the Board faces a substantial likelihood of personal liability. The Defendants disagree and have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure properly to plead demand futility and under Rule 12(b)(6) for failure to state a viable breach of fiduciary duty claim. After carefully reviewing the Complaint and its incorporated documents, and carefully considering the parties' arguments on the motion to dismiss, I conclude that Plaintiffs have failed to plead facts from which it may reasonably be inferred that the Defendants consciously failed to oversee UPS's compliance with its obligations to engage in proper shipping methods or its compliance with the AOD in a manner

that would constitute bad faith. Because they have failed to plead with particularity that Defendants face a substantial likelihood of personal liability in this action, Plaintiffs have failed adequately to plead demand futility and their Complaint must be dismissed with prejudice under Court of Chancery Rule 23.1. Having so concluded, I need not reach Defendants' arguments under Court of Chancery Rule 12(b)(6).

## I.    BACKGROUND

The facts are drawn from allegations in the Complaint, documents integral to the Complaint and matters of which the Court may take judicial notice.[2] As it must at this stage of the proceedings, the Court assumes as true all well-pled facts in the Complaint.

---

[2] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.") (citation omitted); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (on a motion to dismiss, the Court may rely on documents extraneous to a complaint "when the document, or a portion thereof, is an adjudicative fact subject to judicial notice.") (footnotes and internal quotation marks omitted); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) (same); *Reiter v. Fairbank*, 2016 WL 6081823, at *5 (Del. Ch. Oct. 18, 2016) ("where a complaint quotes or characterizes some parts of a document but omits other parts of the same document, the Court may apply the incorporation-by-reference doctrine to guard against the cherry-picking of words in the document out of context.").

## A. The Parties

Plaintiffs, Joseph Horman and Steven Green, were stockholders of UPS at the time of the alleged wrongdoing and have continuously been stockholders since that time. They seek to bring this action derivatively on behalf of UPS.

Defendants, David P. Abney, D. Scott Davis, Rodney C. Adkins, Michael J. Burns, William R. Johnson, Dr. Candace Kendle, Ann M. Livermore, Rudy H.P. Markham, Clark T. Randt, Jr., Carol Tomé, and Kevin M. Warsh (the "Director Defendants"), are eleven members of the twelve-member UPS Board. Abney has served as UPS's CEO and as a director since September 2014. Davis has served as a director since 2006 and as Chairman of the Board since 2008. He previously served as UPS's CEO from 2008 to September 2014.

Nominal Defendant, UPS, is a Delaware corporation with its principal place of business in Atlanta, Georgia. UPS is the world's largest package delivery company and a major provider of logistics and distribution services. According to its 2015 Form 10-K, UPS makes more than 18.3 million package deliveries per day.

## B. The Regulatory Environment Related to the Shipment of Tobacco Products

UPS is subject to a variety of regulatory regimes including federal, state and local laws that regulate its shipment and delivery of cigarettes and other tobacco products. Among these regulations are various special excise taxing initiatives that have the effect of raising the cost of producing and buying tobacco products. These

increased costs, it is hoped, will decrease demand for tobacco products and thereby directly create a public health benefit. The initiatives also raise revenues that can be deployed to educate the public on the harmful effects of tobacco products. By regulating shipping companies, such as UPS, governmental entities attempt to prevent unauthorized and illegal shipments of tobacco that undermine these taxing regimes.

The City and State of New York have adopted a cigarette taxing structure which imposes an excise tax on packs of cigarettes that are possessed for sale within their respective jurisdictions. "Stamping agents," licensed wholesale cigarette dealers, play a key role in the taxing regime by pre-paying the excise taxes, affixing tax stamps to each pack of cigarettes and then setting in motion the process whereby each subsequent purchaser in the distribution chain, ending with the consumer, will bear the tax burden. The stamping agents are the only legal entry point for cigarettes into the streams of commerce of the City and State of New York.

According to regulators, cigarette bootlegging is alive and well in New York. It is estimated that the State of New York loses up to $610 million annually in revenue due to tax evasion schemes. In one such scheme, consumers buy their cigarettes from retailers on Native American reservations. Several sovereign Native American groups in the State of New York dispute the right of the State to require tax stamps on packs of cigarettes sold exclusively at tribal retailers. These sales

5

include both in-person sales and those made by mail order, phone, fax, or online. Through remote means, retailers within Native American reservations can fill orders and ship cigarettes, without excise tax stamps, to non-tribal customers throughout the United States, including in the City and State of New York.

To combat such practices, the State of New York enacted N.Y. Public Health Law ("N.Y. PHL") § 1399-*ll* which, *inter alia*, prohibits common carries, like UPS, from knowingly delivering cigarettes to any person in New York reasonably believed to be a person who is not authorized to receive cigarettes. N.Y. Exec. L. § 63(12) allows the New York Attorney General ("NYAG") to seek various equitable and legal remedies against any person or entity that has engaged in repeated fraudulent or illegal acts in the conduct of business. The violation of a state law or regulation, such as N.Y. PHL § 1399-*ll,* constitutes an "illegal act" under N.Y. Exec. L. § 63(12).

UPS is also subject to federal laws that regulate cigarette and tobacco shipments and delivery, including: (1) the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341, *et seq.*, which makes it "unlawful to knowingly ship, transport, receive, possess, sell, distribute, or purchase" a quantity of more than 10,000 cigarettes which lack tax stamps and are found in a jurisdiction which requires tax stamps; and (2) the Prevent All Cigarette Trafficking Act ("PACT"), 15 U.S.C. § 375, *et seq.* and 18 U.S.C. § 2341, *et seq.*, which requires, *inter alia*,

6

that all packages containing cigarettes include a notice that federal law requires the payment of cigarette excise taxes, and prohibits any shipper from delivering packages on behalf of any person whose name appears on a list of unregistered or noncompliant sellers maintained by the United States Attorney General.

## C. The Assurance of Discontinuance Agreement

In 2004, as part of an effort by the NYAG to combat cigarette tax evasion in the State of New York, the NYAG began investigating residential cigarette deliveries by UPS and other shipping companies. As a result of its investigation, the NYAG concluded that UPS had violated N.Y. PHL § 1399-*ll* by delivering unstamped and untaxed cigarettes to New York residential customers. The investigation revealed that the deliveries, which had been made to residences throughout the State of New York, had originated principally from retailers located on Native American reservations to fill orders accepted over the internet or by telephone. Following the investigation, in order to avoid a civil enforcement action, UPS entered into the AOD on October 21, 2005.[3] The AOD placed affirmative obligations on UPS to set up policies, programs, and procedures to ensure compliance with N.Y. PHL § 1399-*ll*. These measures included investigating shippers, creating a database of tobacco shippers and sharing that list with the State

---

[3] As part of the AOD, UPS expressly denied any wrongdoing or any liability related to the shipment of untaxed cigarettes.

of New York, auditing the shippers, refusing to ship untaxed cigarettes and imposing progressive discipline against non-compliant shipping customers up to and including a ban on those customers from using any UPS service. UPS was also required to maintain a "UPS Cigarette Policy," regularly train its employees on how to ensure enforcement of the policy, conduct compliance audits and maintain associated records. It agreed to a stipulated damages penalty of $1,000 for each violation of the AOD.

The AOD was an evergreen commitment that was binding upon UPS, its employees and its Board:

> This Assurance of Discontinuance shall be binding on and apply to UPS, its officers, directors, employees, affiliates, assignees and any individual, corporation, subsidiary or division through which UPS may now or hereinafter act, as well as any successors in interest.[4]

UPS designated Norman Brothers, its Vice President of the Legal Department, as the point of contact for all notifications from the State of New York concerning enforcement of the AOD.[5]

---

[4] Verified Stockholder Derivative Complaint ("Compl.") Ex. A, Assurance of Discontinuance ("AOD") ¶ 53.

[5] AOD ¶ 38.

**D. UPS Initially Complies with the AOD and Then Allegedly Falters**

Plaintiffs acknowledge that UPS initially complied with its obligations under the AOD.[6]  In December 2005, UPS filed a compliance report with the NYAG, as required under the AOD.  In this report, UPS confirmed that it no longer shipped illegal cigarettes to consumers, only delivered tobacco products from licensed entities, and had issued instructions to its employees to monitor packages for evidence of shipments to unauthorized persons and to report any instances of non-compliance to management.  Approximately two years later, in February 2008, UPS acknowledged that it was not diminishing its commitment to the post-AOD compliance policies even though the United States Supreme Court had issued a decision striking down a portion of Maine's cigarette regulatory regime which was similar in structure to New York's regime.  Later in 2008, Norman Brothers publicly stated that "[w]e have a policy that's been in effect for almost three years now and has been effective, and we see no reason to change it."[7]

According to Plaintiffs, this period of compliance lasted until no later than 2010, when the Director Defendants began to ignore their oversight responsibilities and UPS began to operate in violation of the AOD and applicable state and federal

---

[6] Compl. ¶¶ 7, 9, 55, 78–80.

[7] Compl. ¶ 55.

laws governing the shipment of cigarettes. During this time period, in which it is alleged that UPS delivered thousands of cartons of unstamped cigarettes from manufacturers to cigarette dealers on Native American reservations in New York and then directly to consumers' residences throughout New York and other states, there are no Board-level documents that mention much less directly address UPS's compliance with the AOD or applicable cigarette and tobacco laws. In November 2010, however, Norman Brothers and other members of the Legal Department did make a presentation to the Audit Committee, including Defendants Tome', Burns, Johnson, Markham, Davis and Abney, in which Brothers and his team outlined "significant matters and trends." The minutes of this meeting do not reflect that compliance with the AOD was discussed, although it is alleged that Brothers, as the designated contact for compliance, would have known that UPS was non-compliant and would have reported this to the Audit Committee. The following year, in September, 2011, an internal UPS business development memorandum from "BD Memo"[8] reflects that UPS, at some level, was aware that an investigation had been conducted by the New York State Department of Taxation and Finance ("NYTF")

---

[8] Plaintiffs suggest in the Complaint that "BD Memo" must be shorthand for "Board of Directors Memo." Compl. ¶ 11. They appear to have abandoned that position in their opposition to the Motion. *See* Oral Arg. Tr. 54 ("I initially did think that 'BD Memo' stood for 'board of directors memo,' . . . . [w]hen it was explained that that was not the case, I withdrew that argument.").

and the federal Alcohol, Tobacco, and Firearms Bureau ("ATF"), and that these regulators were alleging that UPS was in violation of the AOD.

At a meeting of the Audit Committee in February, 2014, the committee members were advised that the State of New York and City of New York had already initiated civil litigation against FedEx in New York for violations of cigarette regulations and that "New York City has approached UPS with similar issues."[9] The Audit Committee received similar reports of possible non-compliance in May and August 2014. Although it is alleged that these reports alerted the Director Defendants to potential compliance issues, they came too late to allow them to do anything about the problem.

### E. The Federal Case Against UPS

In February 2015, the City and State of New York filed suit against UPS in the United States District Court for the Southern District of New York alleging that UPS has violated the AOD and state and federal law on numerous occasions over a period of several years. The suit seeks injunctive relief, compensatory damages under federal law, civil penalties under state and federal law, treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), an award of the stipulated damages penalty of $1,000 for each violation under the AOD and the

---

[9] Compl. ¶ 78.

appointment of a court-appointed Special Master to monitor UPS's tobacco deliveries and its compliance with tobacco trafficking laws going forward. In total, the damages and penalties sought amount to at least $180 million.

## F. Procedural History

Plaintiffs filed their Complaint on May 2, 2016, after obtaining books and records from the Company under 8 *Del. C.* § 220. The Complaint asserts one derivate claim on behalf of UPS for breach of the fiduciary duty of loyalty against the Director Defendants arising from their failure to comply with their oversight responsibilities. On June 15, 2016, Defendants filed a motion to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to make a pre-suit demand and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted (the "Motion").

## II.    LEGAL ANALYSIS

*Caremark* claims inevitably arise in the midst of or directly following "corporate trauma" of some sort or another.[10] In this derivative action, Plaintiffs

---

[10] *South v. Baker*, 62 A.3d 1, 12 (Del. Ch. 2012). I pause for a moment to note that UPS has yet to sustain any corporate trauma as the enforcement action is pending in the federal court and, by all accounts, UPS continues vigorously to defend that action. One might well question the wisdom of Plaintiffs' strategy to press claims against UPS prior to the resolution of the enforcement action when those claims rest entirely upon the notion that UPS will suffer a corporate trauma because its active defense of the enforcement action will fail. Given the outcome of the Motion, however, I need not dwell further on the motives or wisdom of this strategy.

12

seek to hold the Director Defendants personally liable to UPS for breaching their fiduciary duties in bad faith in a manner that caused the corporate trauma. After carefully reviewing the Complaint, however, I am satisfied that Plaintiffs have "conflate[d] concededly *bad outcomes* from the point of view of the Company with *bad faith* on the part of the Board."[11] Because I have concluded that demand is not excused under Rule 23.1, I will not reach the Director Defendants' arguments under Rule 12(b)(6). The analysis begins and ends with demand futility.

## A. Legal Standards – Rule 23.1 Demand Futility

"[A] cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[12] Plaintiffs' claim against the Director Defendants for breach of fiduciary duty alleges harm suffered by UPS. The claim, therefore, belongs to the Company and the decision whether or not to pursue it typically would rest with the Board.[13] A board of directors does not stand alone, however, in its authority to initiate litigation on behalf of the corporation. In certain circumstances, stockholders

---

[11] *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *11 (Del. Ch. June 26, 2015).

[12] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (citing 8 *Del. C.* § 141(a)).

[13] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (stating that "[i]n most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation"); *In re Gen. Motors*, 2015 WL 3958724, at *1 (same).

13

may pursue litigation derivatively on behalf of the corporation as a matter of equity to "redress the conduct of a torpid or unfaithful management . . . where those in control of the company refused to assert a claim belonging to it."[14]

Because stockholder derivative suits "by [their] very nature . . . impinge on the managerial freedom of directors,"[15] our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery Rule 23.1 before he is permitted to assume control of a claim belonging to the corporation. To do so, the plaintiff must either demand that the board of directors take corrective measures or pursue the claim or, alternatively, demonstrate that a demand on the board would be futile such that the demand requirement should be excused.[16] When a derivative plaintiff elects not to make a demand upon the board, Rule 23.1 places a heightened pleading burden on that plaintiff to meet "stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" embodied in Court of Chancery Rule 8 and that animate Court of Chancery Rule 12(b)(6).[17]

---

[14] *Aronson*, 473 A.2d at 811.

[15] *Id.*

[16] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[17] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

This Court employs one of two tests when determining whether demand upon the board would be futile. The first applies when a plaintiff challenges a decision of the board of directors to take affirmative action.[18] The second, established in *Rales v. Blasband*[19] and applicable here, applies when a plaintiff challenges board inaction such as when a board is alleged to have consciously disregarded its oversight duties.[20] Under the *Rales* test, the court "must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[21] Particularized facts create a reasonable doubt of the board's independence and disinterestedness when the demand would reveal board

---

[18] *Aronson*, 473 A.2d at 814. Under the *Aronson* test, the plaintiff must plead particularized facts that create a reasonable doubt that (i) the directors are disinterested and independent or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Id.*

[19] 634 A.2d 927 (Del. 1993).

[20] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("The [*Rales*] test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties.").

[21] *Rales*, 634 A.2d at 934.

inaction of a nature that would expose the board to "a substantial likelihood" of personal liability.[22] "The mere threat of personal liability . . . is insufficient."[23]

"On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff—all as it does in considering a motion to dismiss under Rule 12(b)(6)."[24] Given the heightened pleading requirements of Rule 23.1, however, "conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true."[25] Because the Complaint cites documents that Plaintiffs obtained through their Section 220 demand, I may consider those documents under the incorporation-by-reference doctrine to determine whether the Complaint contains sufficient allegations to demonstrate demand futility.[26]

---

[22] *Id.* at 936 (quoting *Aronson*, 473 A.2d at 815). *See also In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) ("Demand is not excused solely because the directors would be deciding to sue themselves").

[23] *Aronson*, 473 A.2d at 815.

[24] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 883 A.2d 961, 976 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) (citing *White*, 783 A.2d at 549).

[25] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).

[26] *See Reiter*, 2016 WL 6081823, at *5–6; *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016).

**B. Plaintiffs Have Not Adequately Pled that Demand is Excused With Respect to Their *Caremark* Claim**

Plaintiffs allege in a single count that the Director Defendants breached their duty of loyalty owed to UPS and its stockholders by "willfully, consciously recklessly, and intentionally failing to perform their duties of oversight to ensure the Company's compliance with positive law."[27] Plaintiffs assert that demand on the Board should be excused based on demand futility because all eleven of the Director Defendants, including nine directors whose independence is unquestioned, face a disqualifying interest in determining whether UPS should pursue the claim. The disqualifying interest, in this case, is self-preservation. Specifically, Plaintiffs allege that each of the Director Defendants "face a substantial likelihood of liability" for their breach of fiduciary duty as alleged in the Complaint.[28]

**1. The *Caremark* Liability Standard**

In *Caremark*, Chancellor Allen reviewed the state of director oversight law and described the circumstances under which stockholders could hold directors personally liable for harm caused to the corporation under the theory that the directors "violated a duty to be active monitors of corporate performance."[29] As

---

[27] Compl. ¶ 157.

[28] Compl. ¶ 96.

[29] *Caremark*, 698 A.2d at 967.

Chancellor Allen first observed in *Caremark*, and has been oft-repeated by this court, proving liability for a failure to monitor corporate affairs is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[30] A decade later, our Supreme Court embraced the *Caremark* standard and clarified that in order to impose personal liability on directors for a failure of oversight there must be evidence that "the directors knew that they were not discharging their fiduciary obligations."[31] At the pleadings stage, a plaintiff must allege particularized facts that satisfy one of the necessary conditions for director oversight liability articulated in *Caremark*: either that (1) "the directors utterly failed to implement any reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[32]

This liability standard "draws heavily upon the concept of director failure to act in good faith."[33] As our Supreme Court explained in *Disney*, the "intentional

---

[30] *Id. See also Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *7 (Del. Ch. Nov. 20, 2007); *Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007); *Guttman v. Huang*, 823 A.2d 492, 506 n. 33 (Del. Ch. 2003) (each quoting *Caremark*).

[31] *Stone*, 911 A.2d at 370.

[32] *Id.*

[33] *Id.* at 369.

dereliction of duty" or "conscious disregard for one's responsibilities," which "is more culpable than simple inattention or failure to be informed of all facts material to the decision," reflects that directors have acted in bad faith and cannot, by default, avail themselves of defenses grounded in a presumption of good faith.[34] In order to plead a claim under *Caremark*, therefore, a plaintiff must plead facts that allow a reasonable inference that the directors acted with scienter which, in turn, "requires [not only] proof that a director acted inconsistently with his fiduciary duties," but also "most importantly, that the director *knew* he was so acting."[35]

Our law recognizes that alleging directors failed to act in good faith is significantly different from alleging that corporate wrongdoing has occurred. This distinction takes into account that "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both."[36] Accordingly, "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."[37] Rather, a plaintiff must plead with particularity

---

[34] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006).

[35] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del Ch. May 31, 2011).

[36] *Stone*, 911 A.2d at 373.

[37] *Desimone*, 924 A.2d at 940.

"a sufficient connection between the corporate trauma and the board."[38]  One way to plead the requisite connection is to plead particularized facts which, if proven, would establish the first *Caremark* prong for imposing oversight liability—that the directors "utterly failed to implement any reporting or information system or controls."[39]  A second, alternative, way "[t]o establish such a connection [is to] plead that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct."[40]  Plaintiffs have attempted to plead both theories.

## 2. No Well-Pled Derivative Claim That the Board Utterly Failed to Implement Any Reporting or Information Systems or Controls

Plaintiffs' argument that they have pled particularized facts that the Director Defendants utterly failed to adopt any reporting and compliance systems is perplexing.  The Complaint and the documents it incorporates by reference acknowledge that UPS implemented the corporate governance changes required by the AOD.[41]  Plaintiffs admitted as much more than once.[42]  The Complaint also

---

[38] *La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[39] *Stone*, 911 A.2d at 370.

[40] *Reiter*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016) (citing *Pyott*, 46 A.3d at 341).

[41] Compl. ¶ 55; Compl. Ex. C at UPS000034.

[42] Pls.' Answering Br. In Opp'n to the Defs.' Mot. to Dismiss the Verified S'holder Deriv. Compl. for Breach of Fiduciary Duty ("Pls.' Answering Br.") 7 ("Initially it appears that

acknowledges that UPS has a Legal Department, an Internal Audit, Compliance & Ethics Department and an Audit Committee of the Board.[43] And, according to the Complaint, "[t]he [Director Defendants] . . . were provided updates about legal compliance through reports from the UPS Legal Department."[44] The Audit Committee's Charter, also referenced in the Complaint, establishes that the Audit Committee's general responsibility for oversight includes oversight of "the Company's compliance with legal and regulatory requirements. . . ."[45] Thus, the Complaint itself reveals that the Plaintiffs have not plead particularized facts that the Board "utterly" failed to adopt or implement any reporting and compliance systems.[46]

---

the Company did comply with its obligations under the [AOD]."); Oral Arg. Tr. 60 ("The company did something in the early years. . . . I'm not really sure what happened from '06 to 2010, but you're correct to say there is no allegation that it was reneged upon.").

[43] Compl. ¶¶ 7, 9, 77(c), 78–80, 87.

[44] Compl. ¶ 9.

[45] Compl ¶ 87.

[46] In *Stone*, the Supreme Court appears quite deliberately to have inserted the adverb "utterly" as a modifier to the phrase "failed to implement any reporting or information system or controls." *Stone*, 911 A.2d at 370. "'Utterly failed' is a linguistically extreme formulation." Bradley R. Aronstam & David E. Ross, *Retracing Delaware's Corporate Roots Through Recent Decisions: Corporate Foundations Remain Stable While Judicial Standards of Review Continue to Evolve*, 12 DEL. L. REV. 1, 13 n.73 (2010) (musing: "Imagine a field goal kicker who misses wide right. He failed, but did he "utterly fail"? Certainly not: he tried and missed. But at what point does the failure become "utter"? If his foot missed the ball? He still would have attempted the kick, and thus would not have "knowingly and completely failed to undertake [his] responsibilities.") (quoted in *Chen v. Howard-Anderson*, 87 A.3d 648, 684 (Del. Ch. 2014)). "Utterly" means "carried to the

Notwithstanding the allegations in their Complaint acknowledging the existence of reporting and compliance systems at UPS, Plaintiffs advance two arguments as to why the Complaint still adequately pleads factual bases upon which the Board faces a substantial likelihood of liability under the first prong of *Caremark*. First, they argue that documents produced in response to their Section 220 demand reveal an absence of any Board minutes or other Board materials relating to the monitoring of compliance with the AOD from January 1, 2010 to February 12, 2014. They contend this informational void supports a reasonable inference that the Director Defendants "did absolutely nothing to oversee UPS's compliance with the [AOD] or cigarette laws in any way."[47] According to Plaintiffs, this period of "deafening silence" at the Board level is a "clear indication of the Board's conscious disregard of its duties and utter lack of oversight over its known duties under the [AOD]."[48] Second, Plaintiffs contend that, regardless of the oversight mechanisms in place, the Director Defendants were "merely going through the motions"[49] in monitoring UPS's compliance obligations. In this regard, they

---

utmost point or highest degree; absolute, total." www.merriam-webster.com/dictionary/utterly (last visited January 9, 2017).

[47] Pls.' Answering Br. 13.

[48] *Id.* 13–14.

[49] *Id.* 23.

note that "recent rulings make clear that merely going through the motions . . . is not sufficient oversight to satisfy a director's fiduciary duty of loyalty with regard to overseeing that the Company is adhering to its fundamental obligation to obey positive law."[50] Neither argument is convincing.

Plaintiffs' positions rely upon the assumption that this board of directors of a large public company owed the Company and its stockholders a duty to take active steps affirmatively to "monitor the monitors" even after implementing a well-constituted monitoring and reporting system.[51] In this regard, Plaintiffs point to paragraph 53 of the AOD which they claim created a Board level obligation to ensure compliance with the AOD beyond ensuring that the Company implemented compliance systems.[52] Even in the absence of the AOD, the UPS Board owed a

---

[50] *Id.* (citing *Rich ex rel. Fuqi Int'l, Inc. v. Chong*, 66 A.3d 963, 982–83 (Del. Ch. 2013)).

[51] ENEMY OF THE STATE (Touchstone Pictures 1998) (Congressman Sam Albert: "We knew that we had to monitor our enemies. We've also come to realize that we need to monitor the people who are monitoring them. . . ." Carla Dean: "Well, who's gonna monitor the monitors of the monitors?"). *See also* Oral Arg. Tr. 61 ("[I]t's incumbent on the board, I think, in this limited situation, to say the board had a duty under the AOD, and they did have a duty to inquire; just inquire."); *Id.* 65 ("But if you have an agreement that gives you an obligation to look into it and a particular role to play, and you do nothing and you know about that, that is conscious disregard.").

[52] Oral Arg. Tr. 44 ("It created a board level obligation. It was binding on the board and its successors; not just the entity, but the board specifically named in paragraph 53 of the AOD was bound by this obligation."); *Id.* 45 ("this was an unusual obligation that bound the board and requires action by the directors"). It is true that paragraph 53 provides that the AOD shall be "binding on and apply to UPS, its officers, directors, employees, affiliates, assignees and any individual, corporation, subsidiary or division through which UPS may now or hereafter act, as well as any successors in interest." Even though the NYAG

fiduciary duty to stockholders not to cause UPS to violate positive law and not to sit

on its hands as it watched others within the Company do so.[53] The Director

Defendants' duty to oversee compliance with these laws, therefore, was not created

or somehow heightened by the existence of the AOD. It derives, instead, from the

fiduciary duty of loyalty and the obligation to discharge that duty in good faith in

the best interests of the corporation they serve.[54] The Board cannot be held liable

for breaching this duty, under the first prong of *Caremark*, unless it can be proven

that its members "utterly failed to implement any reporting or information systems

---

easily could have insisted upon Board-specific covenants, however, the AOD does not set forth any specific obligations that must be met by the Board alone in order for UPS to meet its compliance obligations (e.g. it does not require that the Board receive compliance reports at regular intervals or that the Board charter a new AOD-focused committee). Instead, the AOD contains various and detailed provisions that require the UPS body corporate to comply with positive law and to take affirmative steps to monitor compliance. *See* AOD ¶ 18, 20–32, 34–37. In this regard, it is important to understand what the AOD is and what it is not. The AOD is an agreement between the NYAG and UPS to avoid an enforcement action. The agreement resolved alleged (but contested) violations of state and federal law—violations that took place in the field of operations, not at the Board level. This reality explains why the NYAG would want to bind the Board and other high-level officers so that UPS could not disclaim corporate responsibility for violations of the AOD that occurred further down the chain of corporate command. That the AOD acknowledges an entity-wide commitment to comply with its terms does not equate to a contractual requirement of the Board, or a Board-level promise, to take specific affirmative steps to ensure UPS compliance with the AOD. And it certainly cannot be a basis to dilute the well-settled Delaware law that director liability in the oversight context must be predicated on a failure to perform fiduciary duties in good faith.

[53] *Guttman*, 823 A.2d at 506 n. 34 ("one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey"); *see also* 8 *Del. C.* § 102(b)(7)(ii).

[54] *Stone*, 911 A.2d at 369.

24

or controls."[55]  This is so even if the reporting systems they implemented and relied upon, without reason to suspect they were not working, did not ultimately detect corporate wrongdoing or bring it to their attention.  "[G]ood faith, not a good result, is what is required of the board."[56]  Indeed, "the one thing that is emphatically not a *Caremark* claim is the bald allegation that directors bear liability where a concededly well-constituted oversight mechanism, having received no specific indications of misconduct, failed to discover fraud."[57]

To repeat, the Plaintiffs' own allegations acknowledge the creation and implementation of a system of internal controls following UPS's acceptance of the AOD.  The system functioned well, at least for a time, after the AOD was finalized and the Complaint makes no particularized allegation that the system was intentionally disabled or diminished within UPS.  That the Plaintiffs did not turn up

---

[55] *Id.* at 370.

[56] *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011).  *See also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties"); *In re Gen. Motors*, 2015 WL 3958724, at *14 (dismissing complaint alleging "utter failure" of monitoring systems that was based, in part, upon a lack of documents indicating that the Board was apprised of the litigation risk at issue there, concluding that the complaint did not allege particularized facts showing "that the Board had knowledge that [General Motors'] system was inadequate or that the Board consciously remained uninformed on this issue").

[57] *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006).

any Board documents specifically referencing continued compliance with the AOD during a specific time period is not sufficient to allege that the system was not in place or that the Board was simply going through the motions when overseeing compliance.[58]  At best, the Complaint might support an inference that employees charged with the responsibility to implement UPS's oversight systems failed to report issues to the Board.  This is not enough to sustain a *Caremark* claim.[59]

Plaintiffs have not pled particularized factual allegations to support a reasonable inference that the Director Defendants face a substantial likelihood of

---

[58] Plaintiffs' reliance upon *Fuqi* and *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010) in support of its argument that the UPS Board was simply "going through the motions" is misplaced.  In *Fuqi*, applying "the more lenient pleading standards of Rule 12(b)(6)," the court emphasized that the complaint pled non-conclusory facts revealing that the company itself acknowledged "extensive problems with internal controls" that allowed a reasonable inference that the company had "no meaningful controls in place." *Fuqi*, 66 A.3d at 982–83.  In *Pfizer*, the "true gravamen of the Complaint [was] not the disregard of oversight procedures, but rather that Defendants consciously caused and allowed Pfizer to engage in illegal activity." *Pfizer*, 722 F. Supp. 2d at 459. The Complaint here alleges neither that the Board was even aware of, much less acknowledged, problems with internal controls nor that the Board "caused and allowed" UPS to violate the AOD.

[59] *See Stone*, 911 A.2d at 373 (allegations that "there ultimately may have been failures by employees to report deficiencies to the Board [provide] no basis for an oversight claim seeking to hold the directors personally liable for such failures by the employees"). *See also Armstrong*, 2006 WL 391931, at *6 (holding that it is not enough to plead that "some hypothetical, especially zealous, board might have discovered and stopped the conduct complained of" to impose oversight liability); *In re Gen. Motors*, 2015 WL 3958724, at *14 ("[c]ontentions that the Board did not receive specific types of information do not establish that the Board utterly failed to attempt to assure a reasonable information and reporting system exists" and do not establish the "total lack of any reporting system").

liability based on an utter failure to implement any reporting or information system or controls. Therefore, demand on the Board cannot be excused as futile on that basis.

### 3. No Well-Pled Derivative Claim That the Board Consciously Disregarded Red Flags

To establish demand futility under *Caremark*'s second prong, the Complaint must "plead [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct."[60] In this context, bad faith means "the directors were conscious of the fact that they were not doing their jobs, and that they ignored red flags indicating misconduct in defiance of their duties."[61] Plaintiffs raise four red flags they allege were waved before the Director Defendants and consciously ignored: (1) the AOD itself, (2) the November 2010 Brothers Report to the Audit Committee, (3) the September 16, 2011 internal memo, and (4) the 2014 Audit Committee Presentations. I address these purported red flags *ad seriatim* in chronological order.

---

[60] *Reiter*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016) (citing *Pyott*, 46 A.3d at 341).

[61] *Armstrong*, 2006 WL 391931, at *5. *See also In re Citigroup*, 2003 WL 21384599, at *2 (noting that a director cannot be put on "inquiry notice by something he or she never saw or heard").

27

Plaintiffs' first proffered red flag is nothing more than another attempt to argue that the AOD placed on the Board an additional affirmative duty above and beyond what is required by *Caremark*. According to Plaintiffs, "common sense dictates that legal requirements that the Company failed to adhere to in the past are a red flag for knowledge that there may be continued reluctance to comply in the future."[62] Typically, however, the red flag analogy depicts events or reports that serve as warning signs to the Board of corporate wrongdoing after a system of reporting and compliance is in place. These red flags put the board on notice that the system is not working properly. If the members of the board become aware of the red flags and do nothing in response, and thereby consciously disregard their fiduciary duties, then they each individually are subject to liability for a failure of oversight.[63] In Plaintiffs' view, however, the occurrence of the AOD in 2005 somehow emerged as a red flag for the Board in 2010 and then continued to wave unattended through 2011. I cannot share that view.

---

[62] Pls.' Answering Br. 30.

[63] *See South*, 62 A.3d at 15 (holding that plaintiff must allege that "the board consciously failed to act *after* learning about evidence of illegality") (emphasis supplied); *Stone*, 911 A.2d at 373 (admonishing that "good faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome").

There might well be a reasonably conceivable scenario where the AOD itself could have taken the form of a red flag. For instance, if UPS had entered the AOD in 2005 and then continued a pattern of non-compliant shipments immediately thereafter and through 2014, one might reasonably infer that the Board had consciously disregarded UPS's commitments under the AOD and its own oversight responsibilities.[64] But that is not what Plaintiffs have alleged. Instead, the Complaint acknowledges that UPS complied with AOD in 2005, 2006, 2007, 2008, 2009 and at least part of 2010. No red flags waved on any UPS mast during these more than five years; from the Board's perspective, the compliance systems were working as intended. Even so, Plaintiffs would have the Court conclude they have adequately pled that the Board acted in bad faith from 2010 through 2014 because it did not presume that UPS was engaging in ongoing non-compliant behavior after the AOD and did not take steps to address the non-compliance. Yet the only particularized fact they have alleged in support of this claim is that UPS resolved disputed allegations of non-compliant behavior more than five years prior. Plaintiffs

---

[64] *See, e.g.*, *Massey*, 2011 WL 2176479, at *6–7, *19–21 (noting that despite settlements of an enforcement action and a derivative action that required corporate governance reforms, the complaint alleged with particularity that the company continued a troubling pattern of violations immediately following the settlements for a period of several years leading up to the filing of the complaint, and holding that these pled facts supported a reasonable inference that the Board was "aware of a troubling continuing pattern on non-compliance").

have failed to point to any Delaware law that would support the conclusion they have asked me to draw and I am aware of none.[65] I decline to set that precedent here.

The first of the post-AOD red flags identified by Plaintiffs is the November 2010 Brothers Report to the Audit Committee. Plaintiffs allege that Norman Brothers made a presentation to the Audit Committee on November 3, 2010, and that six of the Director Defendants were present at the meeting.[66] They also allege that the presentation made by Brothers reviewed "significant matters and trends."[67] Based on these allegations, Plaintiffs argue that it is reasonable to infer that Brothers, "given his authority and knowledge under the [AOD], his direct reporting relationship with the Audit Committee, and his status of Vice Secretary of the Audit Committee . . . , knew of UPS's abandonment of its obligations under the [AOD] and reported the same to the Audit Committee in November 2010. . . ."[68] Plaintiffs would have the Court make two inferential leaps here: (1) Brothers knew of

---

[65] *But see In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 175 (D. Del. 2009) (prior finding of wrongdoing not "a 'red flag' that the Directors allegedly disregarded at their peril"); *Zomolosky v. Kullman*, 70 F. Supp. 3d 595, 605–06 (D. Del. 2014) (prior finding of patent infringement did not put directors on heightened notice of ongoing patent infringement).

[66] Compl. ¶ 77(c).

[67] *Id.*

[68] Pls.' Answering Br. 34.

compliance issues related to the AOD; and (2) he reported those issues to the Audit Committee.[69]

Plaintiffs' invitation to play inferential hopscotch does not comport with Rule 23.1's "stringent requirements of factual particularity."[70] While the Court must "draw all *reasonable* inferences in the plaintiff's favor," our Supreme Court has made clear that "conclusory allegations are not considered as expressly pleaded facts or factual inferences."[71] Even reasonable inferences "must logically flow from particularized facts alleged by the plaintiff."[72] Plaintiffs' allegations that Brothers had knowledge of the AOD because he was charged with the ultimate responsibility to implement it, and that he must have advised the Audit Committee that UPS had abandoned its obligations when he reported on "significant matters and trends," are both wholly conclusory. Plaintiffs have not tied these allegations to any particularized facts about what Brothers knew, when he knew it or what he actually told the Audit Committee. Such inferential layering, all the more glaring in that it

---

[69] Oral Arg. Tr. 56 ("inferences are leaps . . . we are entitled to leaps provided that they're reasonable.").

[70] *Brehm*, 746 A.2d at 254.

[71] *Wood*, 953 A.2d at 140 (internal citations and quotations omitted).

[72] *Id.*

follows Plaintiffs' receipt of Section 220 documents, does not satisfy the factual particularity required of Plaintiffs seeking demand excusal.[73]

Plaintiffs' next proffer as a post-AOD red flag the September 16, 2011, memorandum from "BD Memo" which shows that at least one UPS business department was aware of violations of the AOD. This internal company memo reported that the ATF and NYTF were investigating UPS and had determined that UPS customers had illegally shipped cigarettes within New York in violation of the AOD.[74] Plaintiffs maintain that "[i]t is reasonable to infer that, as the contact person for the NYAG, Brothers would have been informed by the NYAG of the [AOD] violations."[75] Going one step further, as Plaintiffs must in order to show that the information reached the Director Defendants, Plaintiffs say that "[g]iven that the Board was bound by the [AOD], and given the Company's wholesale disregard for the [AOD] and cigarette laws and regulations, it is more than reasonable to infer that

---

[73] *Cf. Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW,* 95 A.3d 1264, 1273 (Del. 2014) (holding that it might be reasonable to infer that officers passed certain information on to directors if "officer-level documents" sought in a § 220 demand "establish[ed] director knowledge of the WalMex Investigation by establishing that certain Wal-Mart officers were in a 'reporting relationship' to Wal-Mart directors, that those officers did in fact report to specific directors, and that those officers received key information regarding the WalMex Investigation").

[74] Compl. Ex. C at UPS000034.

[75] Pls.' Answering Br. 35.

Brothers informed the Audit Committee at this time of the wrongdoing, given Brothers' knowledge and his duty to report to the Audit Committee."[76]

Plaintiffs' arguments on this supposed red flag can fare no better than their arguments related to the 2010 Audit Committee presentation because both rest on unsupported and therefore unreasonable inferences. Plaintiffs ask the Court to infer that Norman Brothers received the information contained in the 2011 BD Memo based solely on his position at UPS without tying their allegation to any particularized facts. Once again, the best Plaintiffs can do to prop up the inference they ask the Court to draw is point to the absence of Section 220 documents on the topic of the AOD or illegal cigarette shipments and then argue, given the current federal enforcement action, that Brothers and the Board must have known of ongoing violations. As before, this falls well short of the particularized factual pleading mark set by Rule 23.1.

Moreover, even if the Complaint did plead particularized facts that Norman Brothers knew of the information contained in the BD Memo, Plaintiffs' red flag argument would fail for the independent reason that they have not pled that Brothers actually reported to the Director Defendants after the date of the memo. Brothers 2010 report to the Audit Committee pre-dates the 2011 BD Memo. Therefore,

---

[76] Pls.' Answering Br. 36.

Plaintiffs were required to allege that at some time after the date of the BD Memo Brothers reported information contained in the memo to the Director Defendants. The Complaint says nothing of the sort.

The Eighth Circuit's analysis in *Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke* is instructive with respect to the appropriate treatment of strained inferences.[77] In *Duke*, the plaintiffs adequately alleged that the chair of the Walmart audit committee had received a report of serious criminal wrongdoing and that he was a direct report to the Walmart board of directors.[78] Nevertheless, applying Delaware law, the court concluded that "Delaware courts have consistently rejected . . . the inference that directors must have known about a problem because someone was supposed to tell them about it."[79] In this regard, the court observed that "[o]ther than [pleading facts regarding the officers'] reporting obligations, the shareholders did not plead any facts supporting the inference that the officers actually shared their knowledge."[80] The court noted that "[t]here are no specific allegations showing any of the identified officers met with the board, talked to board members, or otherwise

---

[77] 829 F.3d 983 (8th Cir. 2016).

[78] *Id.* at 988, 991.

[79] *Id.* at 995.

[80] *Id.*

made reports . . ."[81] In the absence of such allegations, the court held that Plaintiffs had not adequately pled demand futility and affirmed the trial court's dismissal of the complaint under Rule 23.1.

Plaintiffs would have the court draw the same unsupportable inferences that were squarely rejected in *Duke*—that Brothers must have informed the Audit Committee of alleged violations of the AOD—without pleading any particularized facts that he actually met with or reported to the Director Defendants after he allegedly obtained this information. This yawning gap between the pled facts and the requirement to plead bad faith cannot be bridged under Delaware law, even at this early stage of the litigation.[82]

---

[81] *Id.* (citing *Wal-Mart Stores, Inc.*, 95 A.3d at 1273; *Desimone*, 924 A.2d at 943).

[82] Plaintiffs' urging that the Court not read too much into the absence of pled facts regarding Board-level knowledge because sophisticated corporate actors "are not apt to write incriminating Board presentations or minutes" (Pls.' Answering Br. 37), and their related citation to *Pyott*, are not only legally unpersuasive, they are misleading. In *Pyott*, the court noted that in order to plead a *Caremark* claim based on illegal corporate conduct, plaintiffs do not have to identify actual confessions of illegality because "sophisticated corporate actors at times engage in illegal behavior and attempt to hide their misconduct with the appearance of legal compliance." *Pyott*, 46 A.3d at 357. The purpose of the court's observation about the behavior of corporate actors in *Pyott* was to point out that it would be too much to require plaintiffs to plead actual confessions of illegality to survive a Rule 23.1 motion because it would be "astounding" if corporate actors openly described their own conduct as illegal in corporate documents. *Id.* An acknowledgement of this basic human instinct for self-preservation is a far cry from a judicial declaration that a court should presume that reports from corporate officers to a board of directors regarding illegal activity occurring in the field of operations would go wholly undocumented.

The third proffered post-AOD red flag is a series of three Audit Committee Presentations from Mohammad Azam, a member of the UPS Internal Audit, Compliance and Ethics department, which brought possible issues of non-compliance to the Director Defendants. The issue raised here is not whether these presentations served as red flags, but whether the Director Defendants reacted to them or consciously disregarded them by doing nothing.

Plaintiffs, of course, allege that the Board did nothing in response to the Azam presentations. The documents Plaintiffs incorporated by reference in the Complaint, however, tell a different story. For example, following the February 12, 2014 Audit Committee Meeting, when the Audit Committee was informed of an enforcement action against FedEx and that New York City had approached UPS with similar issues, the presentation reflects that UPS was going to "increase employee training frequency in the areas with the highest risk," "improve reporting quality by establishing a Help Line for processing and documenting reports," "add a Data Analytics program to identify prospective offenders" and "establish [a] process for investigation to ensure consistency."[83]

Similarly, at the May 7, 2014 Audit Committee Meeting, when the Audit Committee was informed of allegations from the City and State of New York that

---

[83] Transmittal Aff. of Richard Li in Supp. of Defs.' And Nominal Def.'s Opening Br. in Supp. of Their Mot. to Dismiss ("Li Aff."), Ex. 2 at UPS-000005.

UPS was not in compliance with the AOD, the Audit Committee was told that UPS would be performing a "compliance audit of high risk areas in New York," that its "Enhanced Tobacco Compliance Program Draft" had been reviewed by the State of New York, and that UPS had identified "data analytics application updates to improve compliance activity."[84] Lastly, at the August 6, 2014 Audit Committee Meeting, when there was follow-up on the allegations of non-compliance with the AOD, the presentation reflects that UPS had "identified high-risk New York accounts" and that there was "confirmation with all high risk accounts of their regulatory compliance."[85]

The relevant inquiries under the second prong of *Caremark* are whether the Board was made aware of red flags and then whether the Board responded to address them. The documents incorporated by reference into Plaintiffs' Complaint demonstrate that when red flags were waved in front of the Audit Committee, the Board responded. Plaintiffs' counsel admitted as much at oral argument.[86] Plaintiffs have not pled particularized facts that would allow the Court reasonably to infer that the Director Defendants face a substantial likelihood of liability based on having

---

[84] Li Aff., Ex. 3 at UPS-000012.

[85] Li Aff., Ex. 4 at UPS-000018.

[86] Oral Arg. Tr. 53 ("[T]hey did start to get reports from Mr. Mohammad Azam, and those reports show that there was action . . . we're probably in the area there of negligence, but we're not in the area of Caremark post-2014).

37

ignored red flags in a manner that demonstrates a conscious failure to monitor or oversee corporate operations. Demand on the Board cannot be excused as futile on the basis that the Board consciously ignored red flags.

### 4. The Complaint Fails to Plead Particularized Facts that Support a Reasonable Inference that the Director Defendants Acted in Bad Faith Based on the Magnitude and Duration of Wrongdoing

Plaintiffs' final argument is that "[t]he magnitude and duration of UPS's wrongdoing [support] a reasonable inference that the Board was aware of the Company's policy to renege on its obligations under the [AOD]."[87] According to Plaintiffs, their pleading of this dynamic amounts to an adequate pleading of scienter. I disagree.

Plaintiffs' pleading burden is to allege particularized facts that create a reasonable inference that the Director Defendants were "conscious that they were not doing their jobs."[88] Accordingly, to show that the Director Defendants acted in bad faith on the theory Plaintiffs espouse, the pled facts must allow a reasonable inference that the corporate wrongdoing was of such a magnitude and duration that the Board must have known they were not doing their job to look after the corporation's best interests. To be sure, Plaintiffs make numerous allegations

---

[87] Pls.' Answering Br. 26.

[88] *Guttman*, 823 A.2d at 506.

concerning the number of deliveries of untaxed cigarettes made by UPS. What Plaintiffs have not alleged, however, are any particularized facts that would allow the Court to consider the magnitude of these deliveries in the context of UPS's overall operations. In this contextual vacuum, the Court is asked to infer that the Director Defendants must have known they were failing in their oversight obligations based on the magnitude of AOD non-compliance. Saying something is "huge" doesn't make it huge; and saying something is bad faith, without more, does not adequately plead bad faith.[89]

UPS's 2015 Form 10k, incorporated by reference in the Complaint at ¶ 33, discloses that UPS makes more than 18.3 million package deliveries per day. The Complaint alleges that UPS made approximately 78,000 shipments of illegal cigarettes between 2010 and 2014.[90] This is hardly a ratio that alone would support an inference of bad faith.[91] This court's analysis in *Armstrong* is instructive on this point:

---

[89] *Caremark*, 698 A.2d at 972 (describing the corporate liability at issue there as "huge").

[90] Compl. ¶¶ 58–59.

[91] In this important respect, Plaintiffs' allegations differ from several of the cases to which they cite. *See e.g. Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 (9th Cir. 2014) (Botox, the drug being marketed for off-label uses, constituted 24 to 36% of total net sales across all products lines during a nine-year period); *In re Abbott Depakote S'holder Deriv. Litig.*, 2013 WL 2451152, at *1 (N.D. Ill. June 5, 2013) (Depakote, the drug being marketed for off-label uses, accounted for between 8–11% of total sales during a three-year period); *In re Abbott Labs. Deriv. S'holders Litig.*, 325 F3d 795, 800 (7th Cir. 2003) (business division

The court accepts, in principle, that a director could be found liable for remaining ignorant of a large fraud occurring in plain sight, even if the director is able to show that the company had established a full set of supervisory controls. In this case, however, all the plaintiff has said is that the Enron and WorldCom relationships turned out to have material consequences. The complaint does not even allege that either of the challenged relationships formed an unusually large part of Citigroup's business while the relationships were ongoing. The well-pleaded facts provide no basis to believe, therefore, that the directors ignored a mammoth fraud. Rather, the facts only show that, as in *Caremark* itself, the 'liability that eventuated in this case was huge.'[92]

While UPS's ultimate liability may turn out to be significant, as Plaintiffs point to a figure of at least $180 million in fines and penalties to which UPS may be exposed, our law holds that "[a]bsent any facts to show that a board's ignorance can only be explained by a breach of fiduciary duty, such as allegations as to the centrality of the fraudulent relationships to the corporation's business, the size of any financial loss is not a sufficient basis on which to rest liability."[93] Plaintiffs have not, therefore, pled particularized facts from which it can reasonably be inferred that the Director Defendants acted in bad faith based solely upon the size or duration of the alleged wrongdoing.

---

at which corporate wrongdoing occurred represented approximately 22% of total sales and 13% of total profits in the relevant one-year time period).

[92] *Armstrong*, 2006 WL 391931, at *6 (quoting *Caremark*, 698 A.2d at 971).

[93] *Id.*

## III. CONCLUSION

For the foregoing reasons, Plaintiffs have failed to plead particularized facts that demonstrate that demand on the UPS Board would have been futile with respect to their breach of fiduciary duty claim. Accordingly, the motion to dismiss the Complaint with prejudice is GRANTED.

**IT IS SO ORDERED.**